FILED

09/18/2017, 10:06 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Joseph E. Allman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Kevin C. Schiferl
Darren A. Craig
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Carla S. Arthur, as Special Representative of the Estate of Mitch Arthur, deceased, | September 18, 2017 |
| *Appellant-Plaintiff,* | Court of Appeals Case No. 42A01-1610-CT-2307 |
| v. | Appeal from the Knox Circuit Court |
| MacAllister Machinery Co., Inc., and MacAllister Rental, LLC, | The Honorable Sherry E. Gregg Gilmore, Judge |
| *Appellees-Defendants* | Trial Court Cause No. 42C01-1301-CT-5 |

**Altice, Judge.**

## Case Summary

[1]     Carla S. Arthur, as Special Representative of the Estate of Mitch Arthur, (the

Estate) appeals from the trial court's order granting summary judgment in favor

of MacAllister Machinery Co., Inc., and MacAllister Rental, LLC (collectively,

MacAllister). On appeal, the Estate argues that the trial court improperly granted summary judgment on its negligence claim against MacAllister.

We affirm.

## Facts & Procedural History

MacAllister operates approximately twelve equipment rental facilities from which its customers, primarily industrial concerns, rent or lease heavy equipment. In 2008, MacAllister began leasing heavy equipment to Scepter Inc., which operated a secondary aluminum recycling facility in Bicknell, Indiana. Over the years, MacAllister had leased over twenty different aerial boom lifts to Scepter for use in various applications. On January 23, 2012, MacAllister delivered yet another boom lift[1] leased by Scepter to the Bicknell facility.

With every rental, MacAllister performed an inspection of the equipment and completed an Equipment Condition Report (ECR). Those ECRs were presented to, reviewed by, and signed by receiving personnel upon delivery of the equipment. The ECR for the boom lift at issue reflected that an inspection of the boom lift, including checking its fluid levels, tire condition, safety features, decals, manuals, and fuel level, had been performed. It is further indicated on the ECR that the operating controls and safety devices were

---

[1] The boom lift was manufactured by JLG Industries, Inc. and JLG-MHD Indiana, Inc. (collectively JLG).

working properly at the time of delivery. In this same portion of the ECR is a place to acknowledge that "Only properly trained personnel (see back of form) shall operate this equipment." *Appellant's Appendix Vol. 2* at 176 (underlining in original). Next to this statement, the box indicating "yes" is marked. *Id.* On the reverse side of the ECR, the responsibilities of the boom lift's user/operator are set out, including that:

- the user shall ensure only properly trained individuals will operate the aerial platform
- the operator be trained on the equipment
- the user and their operators shall perform work place inspections prior to use of the aerial platform, and
- the user shall direct his operating personnel and supervise their work to ensure operation of the aerial platform in compliance with the provisions as outlined in the manual.

*See id.* at 28, 177.[2]

Mitch Arthur (Arthur) had been a maintenance worker at Scepter's Bicknell facility for over thirty years. During the afternoon of February 3, 2012, Arthur and Dave Overton, a maintenance crew co-worker, were tasked with replacing part of a smelting furnace. The furnace was surrounded by a shrouding/hood and Arthur was using the boom lift to move up inside the hood. Overton was on the ground operating a telehandler to hold the piece that Arthur was

---

[2] The copy included in the appendix of that part of the ECR setting forth these responsibilities is of poor quality and only partly legible. We can, however, decipher enough to be confident with the trial court's findings. We further note that the Estate does not dispute the trial court's findings in this regard.

removing. Arthur and Overton had engaged in this process of using a boom lift to access the inside of a furnace hood on numerous occasions prior to February 3. After Arthur completed his final cuts, he began to move the boom lift out from under the hood using the lift's basket controls. Overton reported that Arthur suddenly became trapped between the lift's basket controls and the furnace hood. As a result, Arthur suffered fatal injuries.

[6] In the days after Arthur's death, a representative from JLG and an investigator with the Indiana Occupational Safety and Health Administration (IOSHA) inspected the boom lift. The JLG representative determined that the lift was functioning properly at the time of the accident. The IOSHA investigator initially determined that MacAllister had violated industry standards when the driver who delivered the boom lift to Scepter "did not offer training to the receiving company employee(s)." *Appellant's Appendix Vol. 5* at 43. MacAllister petitioned for review of this determination, informing IOSHA that MacAllister's employee responsible for the Scepter account had "offered both individualized and group training to the Scepter management" "at the inception of MacAllister's relationship with Scepter." *Id*. at 46, 47. MacAllister asserted that it "stands ready to offer any and all training its customers request," but that Scepter had not requested any such training. *Id*. at 47. Based on this information, IOSHA cleared MacAllister of any violation of industry standard.

[7] On January 25, 2013, the Estate filed its complaint against JLG and MacAllister, asserting claims for products liability and negligence. MacAllister

filed a motion for summary judgment on March 23, 2016.[3] The trial court held a summary judgment hearing on July 8, 2016. On September 30, 2016, the trial court issued its order granting summary judgment in favor of MacAllister. The Estate now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[8] The Estate argues that the trial court improperly granted summary judgment in favor of MacAllister. We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting Ind. Trial Rule 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

---

[3] On July 12, 2013, the product liability claim against JLG was dismissed with prejudice upon the Estate's motion after it was revealed during discovery that JLG manufactured the boom lift more than ten years prior to the accident. The claim against JLG was thus precluded by the products liability statute of repose. In response to MacAllister's summary judgment motion, the Estate conceded that any product liability claim against MacAllister was likewise barred by the statute of repose and explained that its only claim against MacAllister was in negligence.

[9] The initial burden is on the summary-judgment movant to "demonstrate . . . the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761-62 (internal quotation marks and substitution omitted). Where a trial court enters specific findings and conclusions, they offer insight into the rationale for the trial court's judgment and facilitate appellate review, but are not binding upon this court. *Henderson v. Reid Hosp. & Healthcare Servs.*, 17 N.E.3d 311, 315 (Ind. Ct. App. 2014), *trans. denied*. We will affirm upon any theory or basis supported by the designated materials. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

[10] The Estate claims that MacAllister was negligent in providing rental services to Scepter, and as a direct result of that negligence, Arthur suffered fatal injuries while operating the boom lift. Citing industry standards, the Estate alleges that MacAllister had an affirmative duty to inquire as to the application in which the boom lift was going to be used and to train, or offer to train, Scepter employees on how to properly operate the boom lift. In response, MacAllister argues that it was not obligated, by industry standards or general negligence principles, to make such inquiry or to train Scepter's employees as to the proper operation of the lift.

[11] "[T]o prevail on a claim of negligence the plaintiff must show: (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the

applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty." *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016) (quoting *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003)). Here, the issue before us is one of duty. Whether a duty exists is a question of law for the court to decide. *Id.* at 386-87 (citing *Peters v. Forster*, 804 N.E.2d 736, 738 (Ind. 2004)). Absent a duty there can be no negligence or liability based upon the breach. *Id.* at 386. Thus, when it is determined that no duty exists, summary judgment is appropriate. *See Reed v. Beachy Const. Corp.*, 781 N.E.2d 1145, 1148-49 (Ind. Ct. App. 2002) (noting that a defendant is entitled to summary judgment by demonstrating that the undisputed material facts negate at least one element of plaintiff's negligence claim).

[12]  The Estate directs us to the American National Standard for Boom-Supported Elevating Work Platforms, ANSI/SIA A92.5-2006 (ANSI A92.5) as the source of MacAllister's duty as an owner/dealer/lessor[4] of aerial lifts such as the lift at issue. Pursuant to Section 5.7 of ANSI A92.5, dealers "shall *offer* appropriate training to facilitate owners, users, and operators to comply with requirements" set forth in ANSI A92.5. *Appellant's Appendix Vol. III* at 99 (emphasis supplied). The Estate maintains that this provision creates an affirmative duty on MacAllister to train Scepter's employees, including Arthur, on the safe

---

[4] MacAllister acknowledges that it qualifies as a dealer for purposes of ANSI A92.5. Per the definitions contained within ANSI A92.5, MacAllister also seemingly qualifies as an owner and lessor and would thus be subject to the obligations associated therewith. For our purposes, the obligations of an owner or lessor are essentially the same as those imposed upon a dealer.

operation of the boom lift. We disagree. Section 5.7 does not establish a duty on MacAllister to actually provide training, but only that MacAllister *offer* to provide training. Further, this provision does not affirmatively obligate MacAllister to offer training directly to Scepter's employees who might operate the lift. This provision does not create a duty owed by MacAllister to Arthur. We further note that as an owner, MacAllister had a duty to offer training only "[u]pon request of the user." *Id*. at 100. There is no indication in the designated evidence that Scepter requested any training so as to trigger MacAllister's duty to offer training.

[13] The Estate also cites Section 5.8 of ANSI A92.5, which obligated MacAllister to familiarize "*the person designated* by the receiving entity" to accept the aerial platform with certain features, including identification of the weather resistant compartment where the manual is stored and the manual itself, and to review control functions and safety devices specific to the equipment being delivered. *Id*. It is not alleged that Arthur was the person designated to accept delivery of the boom lift at issue. Further, this section does not extend MacAllister's duty in this regard to all employees of Scepter who might operate the boom lift. Thus, contrary to the Estate's claim, MacAllister did not owe a duty to familiarize Arthur with the boom lift.

[14] The Estate also cites Section 5.1 of ANSI A92.5 as support for its allegation that MacAllister owed a duty to determine whether the boom lift was proper for the intended use/environment. Section 5.1 provides:

> Sound principles of safety, training, inspection, maintenance, application, and operation consistent with all data available regarding the parameters of intended use and expected environment shall be applied in the training of operators, in maintenance, application, safety provisions and operation of the aerial platform with due consideration of the knowledge that the unit will be carrying personnel.

*Id*. at 98.[5] The Estate misreads this section as creating an affirmative duty on behalf of MacAllister to train Arthur. Section 5.1 does not require—explicitly or implicitly—that MacAllister inquire into the intended use/environment for the boom lift. Rather, MacAllister only had to use the information available regarding the intended use/expected environment when training employees. And, even though such "[s]ound principles" should be applied in training, such does create a duty on behalf of MacAllister to provide training to Scepter's employees, including Arthur. *Id*.

[15] Supporting our interpretation that Sections 5.1, 5.7, and 5.8 do not impose a duty upon MacAllister as the dealer/owner/lessor to provide training to Scepter employees or to inquire into the application for the boom lift are those sections defining the responsibilities and obligations of users. A "User" is defined as "[p]erson(s) or entity(ies) that has care, control, and custody of the aerial platform," which may also be "the employer of the operator, a dealer, employer, owner, lessor, lessee, or operator." *Id*. at 97. Here, Scepter is the

---

[5] The Estate asserts that "this duty is doubly applied" to MacAllister because the same provision is also contained in ANSI standards relating to lessors of aerial equipment. *Appellant's Brief* at 24.

only entity that falls within the definition of user as Scepter had care, control, and custody of the boom lift and served as Arthur's employer. Section 7.6 of ANSI A92.5 provides that Scepter, as the user, "shall ensure" that the person directed to operate the aerial platform has been trained and familiarized with the equipment. *Id.* at 101. Section 7.7 provides that the user "shall permit only properly trained personnel to operate an aerial platform" and "shall ensure" that the operator is familiar with the boom lift being used. *Id.* at 102. A dealer "shall assume the responsibilities of users" only when the dealer "directs personnel to operate an aerial platform." *Id.* at 99.

[16] The distinction between the responsibilities owed by Scepter as the "user" and MacAllister as the "dealer" makes practical sense. Scepter was in the best position to know which of its employees might be operating the aerial lifts and in what applications/environments the equipment would be used. MacAllister's obligations were to offer training and familiarize a "designated person" with the safety features of the boom lift it was renting to Scepter. Only if MacAllister had directed Arthur in the use of the boom lift would MacAllister have assumed the greater duties imposed on users. In short, the provisions that apply to MacAllister as a dealer do not create a duty owed by MacAllister to Arthur in terms of training and knowledge of the application in which the boom lift was to be operated.

[17] We also find unpersuasive the Estate's argument that ANSI A10.42, which applies to rigging applications, places a duty on MacAllister to train Scepter's employees on the operation of aerial lifts. ANSI A10.42 requires training of

personnel designated to operate rigging tools, but provides that the "employer or other entity responsible for supervising the lifting, hoisting, or movement of a load shall assess the knowledge, skills, and abilities of individuals designated as qualified riggers." *Id*. at 108. MacAllister is not Arthur's employer and had no responsibility for supervising the operation.

[18] In addition to citing ANSI standards, the Estate also argues that MacAllister was negligent in rendering its rental services to Scepter as a matter of common law. Even under a theory of common law negligence, the Estate must establish that MacAllister owed a duty to Arthur. The cases cited by the Estate do not support a finding of duty on the part of MacAllister. Here, MacAllister did not undertake the rendering of services and did not by its actions or inactions increase the risk of harm. The Estate has cited no authority that imposes a duty on MacAllister to inquire into the intended use of the boom lift or to train Scepter's employees. Indeed, no Indiana court has determined that a lessor of equipment has a duty to ensure that employees of the lessee are trained in its use.

[19] The accident in question had a very tragic ending. We, however, agree with the trial court that as applied to the undisputed facts, the law does not place the responsibility for the loss on MacAllister. Because MacAllister owed no duty to Arthur to inquire as to the application for the boom lift or to train or offer to train him regarding operation of the lift, MacAllister is entitled to summary judgment.

[20]   Judgment affirmed.

Kirsch, J. and Mathias, J., concur.